LAWSON, J.
In this personal injury case, defendant Transportation Engineering, Inc. (“TEI”) appeals from an order granting summary final judgment for codefendant D.A.B. Constructors, Inc. (“DAB”), but denying its summary judgment motion on the same *39 issue. Although that portion of the trial court’s order denying TEI’s motion falls outside of our appeal jurisdiction, we conclude that under these unique facts TEI has demonstrated a departure from the essential requirements of the law and irreparable harm, warranting certiorari relief.
RELEVANT FACTS AND PROCEEDINGS BELOW
The Accident and Suit
Vanessa Cruz (“Vanessa”) was tragically killed on July 15, 2008, in a single vehicle accident on the Florida Turnpike. Vanessa was the front seat passenger in a vehicle when the driver lost control, left the roadway, and struck an uncushioned guardrail end at an emergency crossover in the median. The guardrail end struck the car at Vanessa’s door.
Annette Cruz (“Cruz”), as personal representative of the estate of her daughter, Vanessa, settled with the vehicle’s driver for policy limits,[1] and then filed suit against the Florida Department of Transportation (“DOT”), the entity responsible for erecting and maintaining the guardrail; TEI, the company that designed the guardrail; DAB, the company that constructed the guardrail; and two other companies not related to this appeal. In the complaint in effect at the time of the summary judgment hearing (the third amended complaint), Cruz alleged that DOT breached a duty of care to Vanessa by failing to warn the public about or failing to remedy a dangerous condition, not readily apparent to the public, which was caused by an improperly designed and constructed guardrail. Specifically, Cruz alleged that DOT failed to provide safeguards to prevent vehicles from becoming impaled on the guardrail end at the emergency crossover where Vanessa died, and in so doing, DOT failed to follow both national safety standards and its own standards for constructing guardrail ends at emergency crossovers. Cruz similarly alleged that TEI and DAB breached their duties of care to Vanessa by negligently designing and constructing the guardrail ends, and in failing to follow the national safety standards and DOT standards applicable to the design and construction of guardrail ends.
The Turnpike Guardrail Project
Five years before the accident, in 2003, DOT initiated a project to install median guardrails along the entire Florida Turnpike to reduce the number of fatal accidents caused by vehicles crossing the median into oncoming traffic lanes. Because it was separating the oncoming traffic lanes with a guardrail, DOT recognized the need for regular emergency crossovers, or breaks, to allow police and other emergency vehicles to cross the median and access oncoming traffic lanes.
DOT Design Standards
DOT had specific “Design Standards,” derived from national standards, governing the design and construction of guardrails and emergency'crossovers. Design Standard Index 700 required a clear zone of 36 feet for areas where the speed limit exceeds 55 miles per hour. The clear zone is an area next to the road, generally free of obstructions, where drivers can attempt to regain control of errant vehicles. Design Standard Index 400 required “crash cushions” as end treatments for guardrail openings (like those in an emergency crossover) located inside the clear zone *40 (where they are more likely to be struck by fast-moving vehicles, causing injury to passengers). The speed limit was 70 miles per hour where the crash occurred and the guardrail was approximately 30 feet from the road, or within the 36-foot clear zone. Consequently, the Design Standards required crash cushions on the guardrail end involved in this accident.
Outside the clear zone, DOT Design Standards allowed unprotected “Type II” end anchorages, without crash cushions, on exposed guardrail ends. In 2004, crash cushions were at least three to four times as expensive as Type II end anchorages.
DOT’s “Guide Drawings” for Emergency Crossovers
Although the emergency crossover at issue was inside the clear zone, in March 2004, DOT developed preliminary guide drawings specifying Type II end anchorages instead of crash cushions, contrary to its own Design Standard Index 400. In an attempt to prevent vehicles from striking the unprotected Type II end anchorage of the approaching or oncoming guardrail end of an emergency crossover, the trailing guardrail was angled outward so that most errant vehicles heading toward the emergency crossover would strike the trailing guardrail, deflecting them away from the oncoming guardrail end.
DOT’s Mike Shannon maintained that using Type II end anchorages with a “departure angle design” on the trailing guardrail of an emergency crossover was an alternative that served the same purpose as using crash cushions.[2] According to Shannon, the alternative design “waived” the need for crash cushions. Shannon believed this alternative design was derived from “national based information,” based on national studies, but he was not familiar with any specific national or state engineering studies on the alternative design.
TEI’s Design of the Emergency Crossovers
Despite believing that the alternative design in DOT’s guide drawing was “safe,” Shannon nevertheless maintained that the guide drawings were only “concept drawings” to be used as “guidance,” and that TEI had the ultimate responsibility to ensure that its design plans met state and national standards. At one point, DOT and TEI met to discuss the project. A DOT memo memorializing that meeting included the following statement:
*41 TEI discussed receipt of the Turnpike’s comment regarding their turnaround design not being consistent with the standard turnaround design adopted by the Turnpike in March 2004. TEI sited [sic] several reasons to include enhancements to the adopted design; however, the Turnpike requested that they reconsider utilizing the adopted design for consistency with the other guardrail projects unless there was clearly an unsafe aspect with the adopted design. TEI agreed to revise their design.
TEI ultimately submitted design plans for the guardrail ends and emergency crossovers within its scope of work, including the one at issue here. The first page of those designs indicated that the governing standards and specifications for the designs were DOT’s 2004 “Design Standards,” including 2004 Design Standard Index 400. However, consistent with DOT’s March 2004 guide drawings, TEI’s design plans depicted Type II end anchorages instead of crash cushions on all guardrail ends at the emergency crossovers, and DOT accepted TEI’s design plans.
DAB’s Construction of the Emergency Crossovers
DOT hired DAB to construct the guardrails and emergency crossovers at issue according to TEI’s design plans. DOT expected DAB to follow TEI’s design plans. According to DOT’s Shannon, the notes on the design plans referring to the applicable DOT Design Standards did not modify the plans themselves. Similarly, Mark Davidson, a representative of the engineering firm DOT hired to supervise construction, testified the design plan superseded any applicable DOT Design Standards, even though the plans referenced the standards. Thus, if DAB had wanted to install crash cushions, it would have had to seek a modification to the plans. It was not allowed to make unilateral modifications. DAB constructed the guardrails and emergency crossovers according to TEI’s plans, using Type II end anchorages instead of crash cushions. DOT accepted DAB’s completed work.
Cruz’s Engineering Expert’s Testimony on Duty and Breach
Cruz’s standard of care expert, Arnold Ramos, testified that DAB had a duty to ensure that the guardrails and emergency crossovers were constructed according to DOT Design Standards. Consequently, DAB had a duty to ensure that the guardrail ends in the emergency crossover at issue were constructed with crash cushions because they were located inside the clear zone. He acknowledged that TEI’s plans called for Type II end anchorages, but they also referenced Design Standard Index 400, which “put the burden on the contractor to make sure he’s familiar with the standards.” According to Ramos, DAB should have recognized the need for crash cushions and then requested a supplemental agreement or change order from DOT to include them.
However, Ramos testified that TEI was not negligent.
Q If I understand correctly, your— your testimony, as it relates to the design, is that the design adequately calls for a design that meets the State standard; right?
A Yes. As I said earlier, the designer could have been more specific. But all the information, even though they show a Type II end treatment in the little diagram, they do specify in the front page, the Governing Specifications and Design Standards are Index 400, year 2004. So that would tell someone to go look at what’s required.
Q So, am I understanding correctly that you don’t believe that the design *42 professional in this case deviated from the standard of care?
A Not unless there is a memorandum someplace where he raised the issue what do we do about the clear zone and was directed just leave it alone.
Significantly, Ramos was Cruz’s only standard of care expert. And, the only breach of duty identified by Ramos was DAB’s failure to construct the end anchorages using crash cushions, as required by DOT’s Design Standard Index 400.
Cruz’s causation expert, Ying Lu, Ph. D., opined in an affidavit that if an appropriate crash cushion had been installed on the guardrail end, Vanessa would not have suffered any severe head injury and would not have died.
TEI’s and DAB’s Motions for Summary Judgment
After extensive discovery, DAB and TEI filed motions for suihmary judgment. DAB based its motion solely upon the so-called Slavin doctrine. See Slavin v. Kay, 108 So.2d 462 (Fla.1959). The Slavin doctrine has been concisely restated in subsequent cases as follows: “Under the Slavin doctrine, a contractor cannot be held liable for injuries sustained by third parties when the injuries occur after the contractor completed its work, the owner of the property accepted the contractor’s work, and the defects causing the injury were patent.” Plaza v. Fisher Dev., Inc., 971 So.2d 918, 924 (Fla. 3d DCA 2007); see also Foreline Sec. Corp. v. Scott, 871 So.2d 906, 909 (Fla. 5th DCA 2004) (“The Slavin doctrine extinguishes the liability of a contractor for a defect by shifting the duty of care originally owed to others by the contractor to the accepting owner as long as any defects are patent.”). DAB argued that the undisputed evidence satisfied both requirements of Slavin. First, DOT accepted DAB’s construction of the guardrail. Second, the location of a guardrail end, in the clear zone, with Type II anchorages instead of crash cushions, was a patent defect, e.g., open, obvious, and discoverable by DOT.
In its motion, TEI argued that it was entitled to summary judgment for two reasons. First, like DAB, TEI sought summary judgment based upon Slavin and its progeny, relying primarily on Easterday v. Masiello, 518 So.2d 260 (Fla.1988). In Easterday, the Florida Supreme Court was presented with the certified question of whether Slavin precluded recovery against an architect and/or engineers for personal injury to a third party caused by a patent design defect in a structure. The court began its analysis by reasoning that if Slavin applied to contractors, “logic dictates that it would apply likewise to architects and engineers.” Id. at 260. Without further analysis on that point, the court stated that the issue was not so much whether the court would extend the doctrine to engineers and architects, but whether Slavin was still good law. Id. at 261. The court then reaffirmed Slavin as the law in Florida with respect to contractors, architects, and engineers. Id. at 262. Based on Easterday, TEI has consistently and correctly argued that if Slavin barred Cruz’s claims against DAB, it also barred her claims against TEI because the nature of the defect was the same as to both defendants and the patency of that defect was the same as to DOT. TEI further noted that there could be no dispute that DOT had actual knowledge of the alleged defect where DOT expressly required TEI to design the crossovers with Type II end treatments instead of crash cushions.
As its second basis for summary judgment, TEI relied upon the deposition testimony of Cruz’s sole standard of care expert, Ramos, who stated that TEI had satisfied the applicable standard of care by *43 referencing Design Standard Index 400 on its plans.
Cruz’s Evidence in Opposition to Summary Judgment
In response to TEI’s summary judgment motion, Cruz filed the discovery from DOT’s witnesses, summarized above, stating that TEI’s plans did not call for crash cushions, irrespective of the reference to Design Standard Index 400 on the plans. In addition, Cruz filed an expert affidavit from her engineering expert, Ramos, in which he changed his opinion as it related to TEI’s standard of care. In the affidavit, contrary to his deposition testimony, Ramos opined that TEI’s “[rjeference to design standard 400 created[ ] a contradiction between the [plan] detail the design standard which needed to be resolved by the designer and contractor before the project was built.” (emphasis added). Ramos explained in the affidavit that TEI had a duty to follow a specific procedure in order to deviate from “standard 400,” which it did not do, ultimately leading Ramos to conclude that TEI was negligent when it designed the emergency turn around without complying with the Design Standards (requiring crash cushions).
The Summary Judgment Hearing and Rulings
At the summary judgment hearing, Cruz first focused on the latency/patency issue, arguing that the alleged defect in the design alternative to using crash cushions was latent, similar to the alleged defect causing a summary judgment reversal in Florida Department of Transportation v. Capeletti Brothers., Inc., 743 So.2d 150 (Fla. 3d DCA 1999).[3] The trial court unequivocally rejected Cruz’s argument in granting summary judgment for DAB, stating, “I think Slavin applies to bar that.” The trial judge expressly concluded that the defect was patent, at one point reasoning:
[W]e got a metal rod that’s sticking out there uncovered, and no matter what [speed] you project the vehicle going, there is a way that a car could hit this end of it. And that’s why, I guess ... you’re saying the crash cushion is ... [needed] as opposed to hitting a static metal object.
The judge also observed:
And isn’t that what Slavin says? Like, look, if the owner does it, it’s because it’s not like — you know, patent and latent, it’s not like, you know, you can miss the fact that it didn’t have this lack of a bumper on there.
When Cruz later asked for clarification, the court stated,
Well, you’re saying they need [crash cushions]. You’re saying they have a standard that requires them.... DOT knew they weren’t there and they accepted it, and they built what DOT asked for[.] [T]heir people responsible for putting the plan on the ground said it; so they’re out.
*44 The court’s written order also stated, “Based on Slavin v. Kay, 108 So.2d 462 (Fla.1959), DAB’s motions for Final Summary Judgment is Granted.”
However, the court was unconvinced that the same defect could be viewed as patent when addressing TEI’s summary judgment motion. The judge stated:
So you might be able to argue they got what they asked for, but that — it starts breaking down into a lot of nuances: You know, what was the exact distance, you know, who — who goes back and forth to look at it or whatever? You know, I’m just — I’m not sure from a design — between engineers what’s latent and what’s not.
Well, your — I understand your argument — if I do, tell me. But I hear your argument to be, you know, they have a written, promulgated standard that calls for “X.” Okay? They sent out a diagram that didn’t depict X, and then you sent them back another diagram that didn’t depict X.
And so the question is there some type of latent, unexplainable detail between engineers that made that happen? I mean, for instance, if you’re a qualified design group, why didn’t you guys send it back and say, well, “This is better than your sketch you sent us, because you had 400 on it?” And that’s where I think the devil’s going to be in the details, that — that I need to have fully developed and let the jury decide.
And what — that’s the problem I’m having, because the logic of your argument is DOT missed what should be obvious, according to you, that there’s no crash cushions. Your client missed that there should be crash cushions. So doesn’t that in and of itself tell me there must be something latent that two different, separate eyeballs of engineers missed what you’re now telling me should have been there?
The trial judge’s view that the same issue should be viewed differently when analyzing TEI’s liability appears to have been attributable, at least in part, to Cruz’s attempt to analyze the latency/patency issue based upon a new and different theory of liability vis-á-vis TEI. According to Cruz’s counsel, at the summary judgment hearing, TEI was hired to “come up with an alternate design that was safe ... .[so that] the issue really isn’t whether or not there were crash cushions ... [but] whether or not this opening was safe.” When making this argument, Cruz’s counsel “eoncede[d] it’s obvious there’s not a crash cushion,” but argued that there was a latent defect in TEI’s alternative design.
TEI’s counsel countered:
But so we’re in this world of litigation where we have to respond to their allegations. Their- allegations are that the design is defective because there’s not crash cushions. So living in that litigation world where we’re analyzing what their claims are, which is the presence or absence of crash cushions, that defect is obvious to the DOT. It’s — their experts admit that they can just drive up and look at it and you can tell the difference whether there’s a crash cushion or not a crash cushion.
Ultimately, the trial court denied TEI’s motion for summary judgment without stating a clear basis for treating TEI differently than DAB, and then entered a written order that gave no explanation of the basis for the court’s ruling on TEI’s motion.
Cruz’s Motion for Clarification
Subsequently, Cruz filed a motion to clarify the court’s rulings. In part, Cruz *45 asked the court to reconsider its ruling as to DAB, reiterating that the question of whether a defect is patent or latent under Slavin is normally for the jury to decide. It also sought clarification of the two rulings on the ground that “it would be inconsistent for the Court to determine that the Slavin doctrine applies in this case and warrants the granting of a summary judgment on behalf of [DAB] and not' also warrant the granting of a summary judgment on behalf of [TEI].” In the event that the trial court was unwilling to reconsider its ruling as to DAB, Cruz asked that a new order be entered to clarify that summary judgment had been granted as to DAB based upon its lack of duty, instead of Slavin.
TEI filed a response to the motion for clarification and its own motion for reconsideration. It argued that the trial court’s summary judgment for DAB was based solely on Slavin, not on the additional ground of a lack of duty, as asserted by Cruz. It noted that DAB had not sought summary judgment on that additional ground because Cruz’s expert testified that DAB had a duty and breached it by failing to seek a deviation from the Design Standards. Second, TEI argued that there was no expert testimony that any alleged defect was latent. To the contrary, Ramos testified that DOT knew or should have known of the dangerous condition. Finally, TEI pointed out that Cruz had conceded in her motion for clarification that if summary judgment was appropriate for DAB under Slavin, it was also appropriate for TEI.
At the hearing on Cruz’s motion for clarification, TEI asked the court to clarify whether its summary judgment for DAB was based solely on Slavin or on an additional ground as well. The court responded:
[I]t seems to me that I was saying either way D.A.B. is out. So it ought to say, like I said, D.A.B.’s motion for final summary judgment is granted period. See also Slavin.
Because there’s no doubt that that, I mean, I know I didn’t have a problem with the cite being there. Maybe you don’t need the words see also, but I think if you look at the record, you know, the appeal court can say, Judge Takac had two grounds. And the Appellate Court could then say, well, he’s wrong about the one but it didn’t matter, it’s not reversible error because he had the other one right based on the state of the record. And so I’m okay with that.
And knowing Slavin and just having read it, ... I don’t see it applying to really TEI or DOT of liability on the basis of a Motion to Dismiss. And I would point out that if you read Slavin, those cases all went to trial, they talk about the evidence at trial if I’m not mistaken. That wasn’t a summary judgment case.
The court entered a subsequent written order simply stating that summary judgment was denied as to TEI and granted as to DAB, without reference to Slavin. On February 6, 2013, the court rendered a final judgment for DAB. TEI timely appealed on March 4, 2013. Cruz filed a notice of cross-appeal on March 14, 2013, but later abandoned her cross-appeal.
ANALYSIS
Jurisdiction and Scope of Review
TEI’s argument on appeal presents a unique jurisdictional problem. First, TEI has standing to appeal the final judgment that entirely disposes of Cruz’s case against DAB. See, e.g., Benton Inv. Co., Inc. v. Wal-Mart Stores, Inc., 704 So.2d *46 130, 132 (Fla. 1st DCA 1997) (noting that defendant not only has a right but a duty to appeal judgment exonerating codefen-dant to preserve future right of contribution); S. Bell Tel. & Tel. Co. v. Fla. Dep’t of Transp., 668 So.2d 1039, 1041 (Fla. 3d DCA 1996) (noting that absent appeal and reversal of judgment exonerating codefen-dant, defendant cannot seek contribution or place codefendant on verdict form to offset its liability); see also Fla. R. App. P. 9.110(k) (“If a partial final judgment totally disposes of an entire case as to any party, it must be appealed within 30 days of rendition.”). As TEI correctly concedes, however, this court lacks appellate jurisdiction to review the order denying its motion for summary judgment because it is a non-final, non-appealable order. See, e.g., TP Orlando 504, LLC v. Seymour Intern., Inc., 57 So.3d 977, 978 (Fla. 3d DCA 2011) (dismissing appeal of denial of motion for summary judgment for lack of jurisdiction over non-appealable, non-final order); Gionis v. Headwest, Inc., 799 So.2d 416, 417 (Fla. 5th DCA 2001) (“Generally, trial court orders denying motions for summary judgment are non-final, non-appealable orders.”).
Normally, certiorari jurisdiction cannot be used to challenge the denial of a summary judgment motion because a party can raise the summary judgment denial at the conclusion of the case — and “the inconvenience and expense of litigation after an allegedly incorrect interlocutory ruling does not constitute the kind of material harm or irreparable injury for which cer-tiorari review is available.” Mariner Health Care v. Griffith, 898 So.2d 982, 984 (Fla. 5th DCA 2005). Here, however, TEI correctly argues that waiting until the end of the litigation to challenge the trial court’s ruling on its summary judgment motion would deprive TEI of its opportunity to have the jury consider DAB as a potentially responsible party for purposes of apportionment of fault if this court, in a subsequent plenary appeal, were to reject its argument that the absence of crash cushions was a patent defect. In other words, if DAB were to be found liable at trial, it could argue in a subsequent appeal that the judgment against it should be reversed because the defect (lack of crash cushions in the clear zone) causing the injury was, under Slavin, a patent defect, which should have shifted the liability solely to DOT once DOT accepted the completed project. But, there would be no way at that point for TEI to alternatively argue that even in the event that the patency/la-tency issue were a jury question, it should get a new trial in order to attempt to apportion liability to DAB. That issue would have been forever waived by failing to raise it in an appeal from the earlier judgment in favor of DAB. 704 So.2d at 132; 668 So.2d at 1041.
Given the unique fact that TEI and DAB faced the same theory of liability, and sought summary judgment on the same basis, TEI’s current appeal of the final judgment in favor of DAB is an illusory remedy as well. First, because TEI argued below that summary judgment should be entered under Slavin, it is doubtful that TEI could successfully argue for a reversal of the trial court’s order now, given well-established rules regarding preservation of error.[4] See, e.g., Hol *47 land v. Cheney Bros., Inc., 22 So.3d 648 (Fla. 1st DCA 2009) (stating that “we have never excused, however, the requirement that a party seeking appellate review must preserve an issue by first presenting the perceived deficiency to the [lower tribunal]”). Even if there were a way around TEI’s preservation problem, it is hard to view this appeal as an adequate remedy for TEI when arguing for reversal of DABs judgment would require it to abandon its own Slavin defense (in an attempt to demonstrate trial court error on the issue in its initial brief). Understandably, TEI has not attempted to demonstrate that the trial court erred in granting summary judgment in favor of DAB based upon the Slavin doctrine. And, with Cruz having abandoned her cross-appeal, this means that no party has attempted to demonstrate that the trial court erred in granting summary judgment in favor of DAB based upon the Slavin doctrine. As explained by the Florida Supreme Court, “when a decree of the trial court is brought ... on appeal the duty rests upon the appealing party to make error clearly appear.” Lynn v. City of Fort Lauderdale, 81 So.2d 511, 513 (Fla.1955) (citing F E C News Co. v. Pearce, 58 So.2d 843 (Fla.1952)). To this end, Id.; see also Prince v. State, 40 So.3d 11, 13 (Fla. 4th DCA 2010) (“An appellant who presents no argument as to why a trial court’s ruling is incorrect on an issue has abandoned the issue — essentially conceding that denial was correct.”); Sapuppo v. Allstate Floridian Ins. Co., 739 F.3d 678, 680 (11th Cir.2014) (“When an appellant fails to challenge properly on appeal one of the grounds on which the district court based its judgment, he is deemed to have abandoned any challenge of that ground, and it follows that the judgment is due to be affirmed.”); Mitchell v. Allstate Ins. Co., 322 Fed.Appx. 674, 675 (11th Cir.2009) (affirming summary judgment because appellant failed to challenge, and therefore abandoned, two independent grounds given by trial court to support judgment). As such, if we were to limit our inquiry to the order on review under our appeal jurisdiction, that inquiry would end with the observation that TEI has not attempted to demonstrate that the trial court erred by granting summary judgment for DAB based upon the Slavin doctrine, without ever addressing the issue.
[a]n appellant does not discharge this duty by merely posing a question with an accompanying assertion that it was improperly answered in the court below and then dumping the matter into the lap of the appellate court for decision. Under such circumstances it must be held ... that [the appellate court is] under no duty to answer the question.
For these reasons, we agree with TEI that this court’s appeal jurisdiction offers it no adequate remedy on these unique facts, such that certiorari review of the denial of its summary judgment motion is appropriate. See Holden Cove, Inc. v. 4 Mac Holdings, Inc., 948 So.2d 1041, 1041 (Fla. 5th DCA 2007) (“It is settled law that, as a condition precedent to invoking this court’s certiorari jurisdiction, the petitioning party must establish that it has suffered an irreparable harm that cannot be remedied on direct appeal.”).[5] When *48 appellate jurisdiction does not exist, but certiorari jurisdiction exists, the appellate court must treat the cause as if the proper remedy had been sought. Fla. R. App. P. 9.040(c) (2014); Casper & Friends, Inc. v. Nelson, 915 So.2d 646, 648 (Fla. 2d DCA 2005).
Slavin Should Apply on This Record
It was undisputed at summary judgment that DOT accepted the project with bare (uncushioned) guardrail ends within the clear zone, and that this was an open and obvious condition.[6] Therefore, even if TEI violated its standard of care by failing to follow Index 400 in its design[7] or failing to follow some required procedure to deviate from Index 400 (which was the theory of liability belatedly proffered by Cruz’s expert),[8] we agree that summary judgment should have been granted in TEI’s favor based upon Slavin and Easter-day. See, e.g., Plaza v. Fisher Dev., Inc., 971 So.2d 918, 925 (Fla. Bd DCA 2007) (affirming summary judgment for contractor who installed conveyor system without protective guard or kill switch because company accepted completed project containing patent defects as a matter of law); Gustinger v. H.J.R., Inc., 573 So.2d 1033, 1034 (Fla. 3d DCA 1991) (affirming summary judgment for contractor that designed and constructed road improvements for DOT because evidence demonstrated that DOT had knowledge of the specific line-of sight problem created by improvements before deadly accident); Seitz v. Zac Smith & Co., Inc., 500 So.2d 706, 711 (Fla. 1st DCA 1987) (affirming summary *49 judgment for contractors, subcontractors, and engineers where school board accepted improperly assembled floodlight with obvious missing foot peg, which caused plaintiff to fall and suffer injury).
In reaching this conclusion, we note that the liability issue addressed at summary judgment should have been analyzed only in light of those theories of liability supported by some evidence. As previously discussed, Ramos’s testimony focused solely on the absence of crash cushions, which, he opined, were absolutely and unalterably required as a necessary safety precaution by the applicable Design Standards. ‘Where a duty is not so obvious as to be apparent to persons of common experience, as is generally the case with professional negligence, a plaintiff must offer expert testimony to establish the standard of care used by similar professionals in the community under similar circumstances.” U.S. ex rel. J & A Mech., Inc. v. Wimberly Allison Tong & Goo, No. 6:05CV1207 ORL 31DAB, 2006 WL 3388450 (M.D.Fla. Nov. 21, 2006) (citations omitted) (applying rule in Florida design liability case to grant summary judgment for architect due to lack of expert testimony as to any breach of architect’s standard of care). Because there was no expert testimony supporting any other theory of liability, there could be no dispute of material fact precluding summary judgment based upon any other theory of liability. .
For these reasons, we affirm the final judgment in favor of DAB, but quash that portion of the trial court’s order denying TEI’s motion for summary judgment. On remand, we direct the trial judge to enter judgment in favor of TEI.
APPEALED JUDGMENT AFFIRMED; CERTIORARI GRANTED AND ORDER QUASHED; REMANDED WITH DIRECTIONS.
BERGER, J., and MURPHY, M., Associate Judge, concur.

. According to the police report, the driver admitted that at the time of the crash she was driving between 80 and 90 miles per hour with a movie playing on a DVD screen on the console between her seat and Vanessa’s. The driver was cited for careless driving.

. As a matter of logic, this conclusion is confusing in that it is both true and false depending upon whether one is viewing the “purpose” of the crash cushions broadly or narrowly. In the broadest sense, the purpose of both Index 400 and the crash cushions that Index 400 requires under some conditions is to reduce serious injury. And, the departure angle design would appear to serve that same purpose by significantly reducing the number of errant vehicles that could strike a guardrail end at high speed. So, in the broader sense, the alternative design would appear to increase safety and reduce injury that could be caused to passengers in vehicles that enter the median at a high rate of speed. But, in a narrower sense, the crash cushion is designed to reduce injury to passengers in vehicles that actually strike a guardrail end at high speed. And, the departure angle design clearly does not serve that same narrow purpose. Understanding that the overall purpose of the project was to reduce injury and save lives (by preventing cross-over accidents), one could understand DOT determining its chosen design (adding guardrails using the departure angle design in lieu of crash cushions) to be the safest way to address the high number of deaths from cross-over accidents on the Turnpike given budgetajy constraints. But, in the narrower sense, it is important to the issue on appeal to understand that the alternative design does nothing to protect passengers in those vehicles that leave the Turnpike at a direction and angle that propels them into an uncush-ioned guardrail end in the clear zone.

. In Capeletti, the court reversed a summary judgment in favor of a general contractor where there was record evidence that alleged construction defects in a road project were latent defects. 743 So.2d at 152. The defects alleged in Capeletti were removal of a guardrail and failure to construct a roadway embankment at the 4:1 slope required by the plans. The evidence before the court at summary judgment showed that parts of the embankment slope did meet the safe 4:1 ratio, while other parts were steeper-but that the steeper (dangerous) sections would not have been obvious to DOT and would only have been discoverable if DOT had taken detailed slope measurements. With respect to the guardrail, one expert in Capeletti testified that failure to replace the guardrail was not a defect as it did not create a dangerous condition. The other experts testified that although removal of the guardrail created a dangerous condition, the need for a guardrail was not readily apparent at the location of the accident in that case.

. TEI correctly recognizes that the denial of its summary judgment motion is beyond the scope of review permitted in its appeal from DAB’s final judgment. See, e.g., Merkle v. Home Shopping Network, Inc., 916 So.2d 841, 843 (Fla. 2d DCA 2005) '(prohibiting plaintiff from challenging on appeal pretrial orders related to pending claims against one defendant through appeal of final order in favor of another defendant); Cygler v. Presjack, 667 So.2d 458, 461 (Fla. 4th DCA 1996) (prohibiting defendant from appealing summary judg *47 ment for plaintiff on one of her affirmative defenses through appeal of final summary judgment for codefendant because case against defendant was still pending); see generally Philip J. Padovano, 2 Fla. Prac., Appellate Practice § 23:3 (2014 ed.) ("An appeal by one defendant does not bring up for review an earlier order affecting the rights of another defendant if the case is still pending as to that defendant.”).

. Given that the nature and patency of the defect were the same vis-a-vis both defendants, we agree with TEI that it has also *48 shown a departure from the essential requirements of the law and irreparable harm in that the trial court applied the same law differently to two defendants in the same legal position. Cruz attempts to avoid this conclusion by arguing that the trial court did not grant summary judgment in favor of DAB based upon Slavin, but based upon its conclusion that DAB did not breach any duty owed to Cruz. This explanation is belied by the judge’s oral ruling at the summary judgment hearing as well as its initial written order. In addition, because Slavin was the only basis for summary judgment argued in DAB’s motion, it would have been error for the trial judge to have granted summary judgment on any other basis. Gee v. U.S. Bank Nat’l Ass’n, 72 So.3d 211, 215 (Fla. 5th DCA 2011) ("It is reversible error to enter summary judgment on a ground not raised with particularity in the motion [for summary judgment].” (quoting Williams v. Bank of Am. Corp., 927 So.2d 1091, 1093 (Fla. 4th DCA 2006))); Deluxe Motel, Inc. v. Patel, 727 So.2d 299, 301 (Fla. 5th DCA 1999) ("[T]he trial court erred to the extent that, in entering judgment for the sellers, it relied on the arguments made at the hearing but not in the motion.").

.Given the position of Cruz's expert that bare guardrail ends in the clear zone were obvious and violated DOT’S own standards, Cruz was in no position to argue that the dangerousness of the condition was somehow hidden from DOT. See Capeletti Bros., 743 So.2d at 152 ("[T]he test for patency is not whether or not the condition was obvious to the owner, but whether or not the dangerousness of the condition was obvious had the owner exercised reasonable care.”).

. Even though Cruz’s expert, Ramos, testified that DAB did not violate its standard of care based upon its reference to Index 400 on the design plans, TEI correctly recognized that the testimony from DOT’s witnesses (stating that TEI's plans superseded Index 400 and unambiguously eliminated crash cushions in the clear zone, including at the location of the accident) could have been sufficient to create an issue of material fact as to this point.

. Although we have accepted this theory for purposes of analysis, we note that Cruz should not have been permitted to avoid summary judgment on the basis of an affidavit from its expert that materially differed from that expert’s deposition testimony. See, e.g., Lawrence v. Pep Boys Manny Moe & Jack, Inc., 842 So.2d 303, 305 (Fla. 5th DCA 2003) ("It is well established that a litigant when confronted with an adverse motion for summary judgment, may not contradict or disavow pri- or sworn testimony with new and starkly different sworn affidavit testimony, solely to avoid summary judgment.”).